# SECTION 445

# MILL MIXED USE DEVELOPMENT DISTRICT

Section 445.1    **Intent**.

a.  The intent of the Mill Mixed Use Development District (hereinafter referred to as MMUD District) is to provide the opportunity to fully utilize former mill structures and related properties that are part of the Town's landscape, character, and history.  They are also places of economic activity and economic opportunity.  Recognizing the unique and special characteristics of these mill structures the Town has established a special district to protect and maximize their potential.  Specifically, this regulation is intended to:

1. Provide maximum flexibility for the development and enhancement of mill properties;

2. retain the potential for business and industrial development in specified mill locations while permitting residential development;

3. foster a greater opportunity for creative development which encourage a mix of uses (residential, commercial, and industrial) within former mill buildings;

4. to enhance business vitality, and provide employment opportunities;

5. to enhance and protect the Town tax revenues, and;

6. encourage the development of flexible space for small and emerging businesses.

Section 445.2    **General Requirements**.

a.  All uses shall be served by public water and sewer.  The requirement for public water may be waived in whole or in part by the Commission if the applicant can establish, to the satisfaction of the Commission, that potable water requirements can be realized through on-site systems.  A request for a waiver shall be submitted in writing by the applicant at the time application is made. The request shall detail the extent of the waiver requested and contain sufficient data for the Commission to make the

findings required above. The applicant shall submit a written report on the adequacy of the proposed alternative water supply system of each proposed building lot and/or use prepared by a Professional Engineer licensed to practice in the State of Connecticut certifying either that each lot and/or use is satisfactory for private water supply systems constructed in accordance with the standards of the State of Connecticut or specifying the location or conditions under which such systems would meet such standards. All technical work done in conjunction with the submission of such applications shall be done by a State of Connecticut Professional Engineer in accordance with the Rules and Regulations of the State Board of Professional Engineers and Land Surveyors, dated January 1, 1996, as amended. The applicant shall further request and secure documentation from the Northeast District Department of Health that they concur with the findings of the applicant's engineer.

b. All developments shall be reviewed for compatibility with the Killingly Plan of Conservation and Development and be supportive of the public health, general welfare and safety of the community, including adequate provision of public facilities and a minimum number of access points on existing roads.

c. Property shall, at the time application for MMUDD designation is made, have a mill structure located on site, including but not limited to the following:

1. P&A Mill, 42 Maple Street
2. Risom Mill, 43 Connecticut Mills Avenue
3. Prym Mill, 400 Hartford Pike
4. Prym Mill, 444 Hartford Pike
5. Acme Mill, 963 Bailey Hill Road
6. Hale Mill, 244 Ballouville Road

Properties designated as MMUDD are not subdividable.

d. The commission may, at its discretion, hire a third party consultant, also acceptable to the applicant, to aid the commission in its review of any proposed use or site. The fees charged by the third party consultant shall be borne by the applicant.

Section 445.3  **Definitions**.

a. For the purpose of these Regulations, certain numbers, abbreviations, terms and words used herein shall be used, interpreted and defined as set forth in this section. Unless the context clearly indicates to the contrary, words used in the present tense include the future tense; words used in the plural number include the singular; the word Regulations means these Regulations; shall is always mandatory; may is permissive.

1. Mill Structure shall mean a structure, currently or formally used for industrial purposes, which has been abandoned, idled, or underutilized where expansion or redevelopment is complicated by real or perceived environmental contamination and/or site development costs and which offers potential for new or enhanced development.

2. "Rooming and/or Boarding House" shall mean a building or structure or part of a building or structure kept, used or advertised as or held out to be a place where sleeping accommodation is furnished to roomers whether for remuneration, compensation or not, but shall not include a hotel, hospital or nursing home.

Section 445.4    **Allowable Uses by Special Permit.**

a. All Industrial, Commercial and Residential uses not prohibited under Section 445.5, subject to the performance and compatibility standards in Section 445.6 of this section and the application and permitting requirements of Subsection 445.7 are permitted by Special Permit.

b. Within the MMUD District there shall be no restriction on combining different categories of use, provided such uses conform with the compatibility and performance standards found in Section 445.6, within the same building except any imposed by the State Building Code or other federal, state, or local regulations.

c. An erosion and sedimentation control plan, under provisions of Section 590 of these Regulations, shall be required when the proposed development will result in a disturbed area that is cumulatively more than one-half acre in size, or when the Commission determines that special site conditions warrant such a plan.

Section 445.5    **Prohibited Uses**.

a. Adult Entertainment uses

b. Animal sales

c. Animal Agriculture

d. Automobile or truck sales

e. Bulk storage or manufacture of materials or products[1] that could decompose by detonation

---

[1] These materials include primary explosives such as lead azide, fulminates, lead styohnate, and tetracene; high explosives such as TNT, RDX, HMX, PETN and picric acid; propellants and their components such as dry nitrocellulose, black powder, boron hydrides, and hvdrazine and its derivatives; pyrotechnics and fireworks such as magnesium powder, potassium chlorate, and potassium nitrate; blasting explosives such as dynamites and nitroglycerine; unstable organic compounds, such as acetvlides, tetrazoles and ozonides; strong oxidizing agents such as liquid oxygen, oerchloric acid. perchlorates, chlorates, and hydrogen peroxide in concentrations greater than 35 percent; and nuclear fuels, fissionable materials and products, and reactor elements, such as uranium-23S and plutonium-239.

    f. Camps (day/boarding)

    g. Car Wash

    h. Equestrian Stables (unless the property has ten (10) acres or more)

    i. Cemeteries

    j. Churches

    k. Collection Centers

    l. Dog Kennels

    m. Drive-up services associated with any commercial use (other than banks)

    n. Golf Courses

    o. Letting Of Rooms

    p. A facility that contains or conducts research involving Biological Safety Level-3 (or the equivalent term Risk-Group-3) classification or higher.

    q. Rendering

    r. Rooming and/or boarding House

    s. Seasonal Camping/Tents

    t. Service Stations

Section 445.6   **Performance and Compatibility Standards**.

    a. Compatibility

    1. All new uses shall demonstrate, to the satisfaction of the Commission, that any such new uses (in addition to meeting the requirements of this section) are compatible with all existing uses.

        a. Any new buildings or accessory structures shall relate harmoniously to each other with adequate light, air circulation, separation between buildings and, to the extent practicable, shall be in harmony with the existing district.

        b. Buildings or structures that are listed on the National Register of Historic Places shall be converted, constructed, reconstructed, restored or altered to maintain or promote the status of the building

or structure on the State or National Register of Historic Places.

b. Access and Traffic Impacts

1. Traffic and safety impacts to the existing and proposed roads shall be minimized.

2. Access shall be provided to the extent feasible through an existing side street or a shared driveway; curb cuts shall be limited.

3. Pedestrian and vehicular traffic shall be separated;

4. Walkways shall be provided for access to adjacent properties and between businesses.

c. Nuisance Avoidance

1. Uses shall cause no inherent and recurring generated vibration perceptible without instruments at any point between two or more uses or along a property line. Temporary construction is excluded from this restriction.

2. Smoke shall not be visible beyond a shade darker than No. 1 on the Ringleman Smoke Chart.

3. Heat and glare generated from within a structure or use shall not be discernible from the outside of any structure.

4. Odor, dust, and fumes shall be effectively confined to the premises or so disposed as to avoid air pollution.

5. No activities involving bulk storage or manufacture of materials or products that could decompose by detonation shall be permitted. These materials include primary explosives such as lead azide, fulminates, lead styohnate, and tetracene; high explosives such as TNT, RDX, HMX, PETN and picric acid; propellants and their components such as dry nitrocellulose, black powder, boron hydrides, and hydrazine and its derivatives; pyrotechnics and fireworks such as magnesium powder, potassium chlorate, and potassium nitrate; blasting explosives such as dynamites and nitroglycerine; unstable organic compounds, such as acetvlides, tetrazoles and ozonides; strong oxidizing agents such as liquid oxygen, oerchloric acid. perchlorates, chlorates, and hydrogen peroxide in concentrations greater than 35 percent; and nuclear fuels, fissionable materials and products, and reactor elements, such as uranium-23S and plutonium-239. Utilization of the materials included in this section shall be limited to the minimum quantities necessary for specific research and only after the procurement of all required local, state and federal permits. Material type, quantity, storage. handling procedures, and location in

the facility shall also be registered with the respective fire district, ambulance corps, the Killingly Planning Department, and Fire Marshal.

6. Any electrical radiation shall not adversely affect at any point any operations or any equipment, including not only professional research equipment but also equipment reserved for personal uses such as reception of public radio transmissions, use of cellular p hone, etc, except equipment belonging to the creator of the electrical radiation.

7. No use abutting residential use shall engage in or cause very loud activities between the hours of 9 P.M. of one day and 7A.M. of the following day.

8. Non-residential uses shall be designed and operated, and hours of operation limited where appropriate, so that neighboring residents are not exposed to offensive noise, especially from traffic or late-night activity. No amplified music shall be audible to neighboring residents.

9. Common walls between residential and non-residential uses shall be constructed to minimize the transmission of noise and vibration.

   d. Lighting

   1. A lighting plan showing existing and proposed exterior lighting, including building and ground lighting; locations, supports, mounting heights, and orientation of all luminaires and light distribution patterns is required.

   2. Parking areas shall be illuminated to provide appropriate visibility and security during hours of darkness.

   3. Exterior lighting shall be architecturally integrated with the building style, material and colors.

   4. Exterior lighting of the building and site shall be designed so that light is not directed off the site, including above the site and the light source is shielded from direct offsite viewing.

   5. Fixture mounting height should be appropriate for the project and the setting. Use of low, bollard-type fixtures, three to four (3-4) feet in height is encouraged as pedestrian area lighting. The mounted height of fixtures in smaller parking lots or service areas should not exceed sixteen (16) feet, with lower mounting heights encouraged, particularly where adjacent to residential areas or other sensitive land uses.

   6. Raised light pole bases shall be attractively designed and well-detailed to be compatible with the overall project.

   7. The use of vandal resistant well lighting is encouraged for lighting

monument signs.

8. All parking areas and pedestrian facilities serving non-residential uses and open to the general public shall be provided with illumination during all hours from dusk to dawn that those facilities are open to the general public.

e. Residential Use Restriction

1. Residential uses created within the MMUD District shall have a note placed on the deed to the parcel notifying potential buyers of the probability of non-residential uses elsewhere on the district site. Such note shall state: *"This property is currently part of a Mill Mixed Use Development District which allows a variety of non-residential uses within the same district and on the same site."*

2. Residential buildings to be constructed or rehabilitated shall be designed to filter out noise and vibration through construction employing, but not limited to, such techniques as applying soundproofing material between dwelling units laterally and vertically, and between different uses; employing staggered joists and insulation.

3. Residential density will be limited to the density of the abutting residential zoning district. When two or more districts abut the MMUD District, the highest allowable density shall prevail.

4. For any development involving more than 15 residential units in total, it shall be a condition precedent that at least 15% of the total project cost shall be allocated to improvements to the existing mill structure. This minimum shall be determined by the commission based upon cost estimates submitted by a duly licensed engineer or architect. This requirement is based upon the importance - historical, cultural, economic and aesthetic, in maintaining and rehabilitating these mill structures.

This requirement may be met by either actual mill structure construction prior to the issuance of residential building permits outside of the mill structure or by surety acceptable to the town, together with an acceptable concept plan and time line for completion of mill improvements.

5. Residential uses (apartment and condominium units) shall be permitted in existing structures and shall consist of not less than eight-hundred (800) square feet of livable space.

f. Buffers, Density and Height

1. Where a MMUD District abuts a residentially zoned property, a buffer

strip of seventy-five (75') feet shall be required for any new non-residential development. Such buffer shall be planted with year-round screening vegetation adequate to buffer the view from the residential zone. Preservation of existing trees and vegetation is preferred where they provide desired screening.

2. Where the MMUD District abuts a residentially zoned property, a buffer strip equal to the abutting setback requirements shall be required for any new residential development.

3. To reduce the bulk and area of buildings and pavement relative to the overall size of the development; and to provide landscaped areas for visual and sound-buffers, increased groundwater recharge and reduced stormwater runoff, the total area of any MMUD District that may be covered by buildings and paved surfaces shall not exceed fifty (50) percent. The Commission may allow by Special Permit an increase to a maximum of sixty (60) percent impervious coverage when the Commission finds that one or more of the following benefits of the development outweigh the impacts of the increased impervious coverage:

    a. The use of grass/pavement block systems or similar treatment reduces storm water runoff; and/or

    b. The development achieves an overall benefit to the community such as elimination of blight conditions, preservation of historic structures, closure of excessive curb cuts, provision of inter-parcel access or service roads or similar benefit.

4. Maximum Building heights shall be as follows:

    a.    Residential - thirty-five (35) feet

    b.    Commercial - forty (40) feet

    c.   Industrial - forty (40) feet

5. For existing mill structures:

    a. Telecommunication facilities, water tanks, solar collection systems, similar structures and necessary mechanical appurtenances may be erected on an existing mill structure to a height greater than the limit established for the MMUD District provided that no such exception shall cover at any level more than twenty-five percent (25%) of the area of the roof on which it is located, except for a solar collection system which may cover more than twenty-five percent (25%) of the area of the roof on which it is located if the architectural design and layout is compatible with that of the structure to

      which it is affixed and generally in keeping with the character of the neighborhood in which it is to be situated; and provided further that no such exception shall be used for residential, commercial or industrial purposes other than such as may be incidental to the permitted use(s) of the main structure.

    b. Roof structures and/or roof lines may be integrated together where more than one roof line or roof style is present.

6.    The height limitations of these Regulations for new construction shall not apply to chimneys, gables, cupolas, spires, water towers, flag poles, transmission towers and cables, radio or television antennae or towers or telecommunication service facilities B provided that the telecommunication facility, and its antenna(s) or associated equipment does not extend more than five (5) feet above the highest point of the building or structure to which it is attached.

**g.** Outdoor Storage and Sales Display

1. Except as specified below, outdoor storage or display of goods shall be enclosed within permanent walls or fences integrated into the design of the building.

    a. Storage or display racks and goods thereon shall not exceed the height of screening walls or fences.

    b. Goods shall not be displayed in landscaped areas, on exterior walls, or in parking lots.

    c. The Commission, at its sole discretion, may permit the outdoor display and sale of merchandise on sidewalks if a written request accompanies the application stating the nature of the outdoor sales including: the location, duration, and types of merchandise to be sold.

    d. Outdoor display areas shall be delineated on the Site Plan and/or Concept Plan and shall not impede the normal use of sidewalks or other pedestrian walkways.

    e. No vending machines shall be allowed outside of any buildings.

    f. All materials, supplies and equipment shall be stored in accordance with Fire Prevention Standards of the National Board of Fire underwriters and shall be screened from view from public ways and abutting properties.

h. Waste Disposal

1. Garbage or recycling dumpsters/compactors shall have doors or lids that shall remain closed when not being loaded or unloaded and shall be contained in masonry enclosures supplemented with landscaping if necessary.

2. No delivery, loading, trash removal, compaction or other similar operations shall be permitted between the hours of 8:00 p.m. and 6:00 a.m. unless the applicant submits evidence that sound barriers between all areas for such operations effectively reduce noise emissions.

i. Signs

1. Signs shall conform to Section 540, for each use on the site and, in addition to those requirements, the following:

a. All signs shall be architecturally integrated with their surroundings in terms of size, shape, color, texture, and lighting so that they are complementary to the overall design of the building and are not in visual competition with other signs in the area.

b. Signs shall be proportionate to the dimensions of their location.

c. All signs shall complement their surroundings without competing with each other, shall convey their message clearly and legibly, shall be vandal-proof and weather resistant, and if illuminated, shall not be overly bright for their surroundings.

d. Exterior lighting of the building and site shall be designed so that light is not directed off the site and the light source is shielded from direct offsite viewing.

e. New signs proposed for existing buildings shall provide a compatible appearance with the building signage of other tenants. With multiple signs on a single building, attempt to bring in a unifying element (such as size), even where no sign program exists.

f. New construction design shall anticipate signage and, where necessary, a sign program. New building design should provide logical sign areas, allowing flexibility for new users as the building is re-tenanted over time. Designs which provide for convenient and attractive replacement of signs are encouraged.

g. The use of roof signs shall be prohibited.

h. Freestanding signs shall not be greater than five (5) feet in height. Monument sign materials shall reflect the character of the use and the building the sign identifies.

  i. Free-standing sign bases shall be made of permanent, durable materials such as concrete or brick. Bases made of texture-coated sheet metal are discouraged.

  j. Landscaping and irrigation shall be designed around the base of freestanding signs to integrate the sign with the ground plane and screen out any low level flood lights. Irrigation shall be designed so it does not damage the sign.

  k. Freestanding signs on poles which have a top-heavy appearance are discouraged.

  l. Driveway directional signs shall only be used for projects where circulation is complex and traffic must proceed through the site along a specific path for service. Where the layout of the parking lot and driveways are obvious and clearly apparent to the driver entering from the street, directional signage is not appropriate. When not appropriate or needed, such signage can visually clutter the site and will be discouraged.

  m. Any external spot or flood lighting shall be arranged so that the light source is screened from direct view by passersby, and so that the light is directed against the sign and does not shine into adjacent property or blind motorists and pedestrians.

j. Landscaping Requirements

1. Existing trees shall be maintained as practicable and any new trees shall be carefully selected and located where they will complement the building elevation and shall not block all retail storefront signage from view.

2. Screening of mechanical equipment, trash, and loading areas shall be provided through the use of walls, fences, and/or dense, evergreen plant materials.

3. Landscaping and screening plant materials shall not encroach on the public walkways or roadways in a way that impedes pedestrian or vehicular traffic.

4. Shrubs or trees that die shall be replaced within one growing season.

5. All new plant materials shall be sized so that the landscaping has an attractive appearance at the time of installation and a mature appearance within three years of planting.

6. All proposed shrubs except accent, color or ground cover planting shall be a minimum of 5 gallon size. Shrubs and ground cover plants

shall be spaced close enough together to ensure an attractive and mature planting effect.

7. Energy conservation within structures shall be addressed by recognizing the sun exposure on the site and providing or maintaining appropriate tree species (deciduous trees on the southern exposure, coniferous and broadleaf evergreen trees along the eastern and western exposures, and evergreens along the northern exposure.)

8. Tree species, when additional trees are proposed, should be selected with root growth habits that will not cause damage to sidewalks, or such tree species should be sited away from such hardscape areas.

9. Landscaping plans shall show all obstructions such as street lights, meters, backflow devices, utility covers, transformers, and similar objects which may affect plant placement and installation limitations.

10. When constructing new landscape planting areas on surfaces which where previously covered by pavement or structures, all existing asphalt, base rock or other deleterious material shall be removed to the depth of the native soil and clean soil shall be used to backfill the planting area.

11. All exposed dirt areas shall be covered with bark or mulch or other weed control measures included as part of final landscape

12. Street tree placement shall include consideration for vehicle line of sight, entrance and exit curb cuts, street light and traffic control devices, and other site specific conditions as part of design review process.

k. Parking and Loading Areas

1. Parking shall conform to Section 530 and additionally shall meet the following standards:

 a. Parking lots shall provide well defined routes for vehicles, delivery trucks, and pedestrians.

 b. Loading areas visible from a public street or adjacent property shall be screened with masonry walls supplemented by landscaping if necessary.

 c. To the maximum extent feasible, landscaped islands with raised curbs shall be used to define parking lot entrances, the ends of parking aisles, and the location and pattern of primary driveways, and to provide pedestrian walkways where appropriate.

    d. Parking areas shall be screened from adjacent residential uses, streets, and walkways using trees and shrubs adapted to the region, of specimen quality conforming to the American Standard for Nursery Stock, American Standards Institute, Inc., 230 Southern Building, Washington, DC 20005, and shall be planted according to accepted horticultural standards. Berms may be used for screening along the street in conjunction with plant materials.

    e. Where a mix of uses creates staggered peak periods of parking demand, shared parking calculations shall be submitted to reduce total required parking.  A reserve area for future development shall be provided on the Site Plan.

    f. The use of porous pavement and/or perforated brick or block shall be used to the extent feasible to increase on-site water retention for plant material, groundwater supplies, and to reduce problems associated with runoff.

    g. Within the Town's right-of-way all curbing shall be constructed of concrete.  However, the Town Engineer may waive this requirement, when in his/her opinion the use of concrete curbing is not necessary.

l.  Medical and/or Biological Research

1. In the establishment, operation, and design of medical and biological research laboratories and facilities, the standards and procedures. as amended, of the National Institutes of Health, Bethesda, Maryland and Centers for Disease Control will apply. No facility shall contain or conduct research involving Biological Safety Level-3 (or the equivalent term Risk-Group-3) classification or higher.

Section 445.7    **Applications and Permit Procedures.**

a. Before an application is made, it is suggested that the applicant become familiar with the regulations contained in this section as well as those contained in Article VII which addresses Special Permits and Section 470.7 which addresses Site Plan, and consult with the Planning and Zoning Commission and/or planning department office for other regulations to consider and for any clarifications.

b. There are two application procedures for development in the MMUD District:

    3. A Concept Plan application for the entire MMUD District without a

    Special Permit application for specific land uses and

    4. A Special Permit application for each proposed use within the MMUD District.

  c. Concept Plan Application.

   1. Purpose. The Concept Plan is intended to illustrate the general development plan and expected land uses without requiring the detail and expense of the Site Plan required as a part of a Special Permit submittal.

   2. Exemptions.

     a. The Concept Plan is not required when the Site Plan submitted with a Special Permit application includes all proposed uses and development in the entire MMUD District.

     b. The Concept Plan is not required when the proposed development is restricted to an existing mill structure and development directly related to such mill structure (parking, landscaping, signs, etc....).

   3. Procedure. The following procedure shall apply when an applicant seeks approval only of a Concept Plan.

     a. Application. The applicant shall file with the Commission an application for Concept Plan approval on such form as provided by the Commission and such application shall be governed by the requirements of the Connecticut General Statutes for a site plan.

     b. Minimum Area. The minimum area covered by the Concept Plan shall be all land within the MMUD District.

     c. Elements of Concept Plan. The Concept Plan shall be prepared by an engineer, architect, or landscape architect, and shall include:

       1. Drawings at a scale of 1" = 100'.

       2. Existing topography, with two (2) foot contours, to show the general gradient of the site, existing structures, existing roads and rights-of-way, major topographic features (including wooded and open areas, ledge or outcroppings), inland wetlands, watercourses and flood plain.

3. The land uses and zoning within 300 feet of the site.

4. Boundary description of the district within it.

5. Names of all abutting property owners.

6. The location of all proposed roadways, parking areas, setbacks, rail lines, easements, land use areas, open space areas, and access locations from connecting roads and driveways within the site to the existing public road system.

7. The site shall be divided into general land use areas, identified as one or more of the specially permitted uses (e.g. retail, restaurant, office, research lab, etc.).

8. Proposed building footprints and location of parking areas.

9. Letters from the public water company and the Water Pollution Control Authority stating how service is to be provided to the proposed land uses.

10. A preliminary traffic analysis prepared by a professional engineer which shall include, but not be limited to the following:

    a. Land use, site and study area boundaries.

    b. Existing and proposed site uses.

    c. Existing and proposed roadways and intersections.

    d. Existing and proposed roadways and intersection capacities and volumes.

    e. Trip generation and design hour volumes.

    f. Trip distribution.

    g. Trip assignments.

    h. Existing and projected traffic volumes.

    i. Levels of service of all affected intersections for the design

hour.

j. Future traffic impact analysis

1. Short term horizon - one year after occupancy.

2. Long-term horizon - 20-years after occupancy.

11. A preliminary stormwater discharge plan, prepared by a professional engineer, which shall include as a minimum the following:

a. A map showing project location, description of the property, acreage, topography, identification of major drainage ways involved, proposed type of development, identification of wetlands based on soils map and a reference to any flood hazard area delineation study applicable to the site

b. A map of the tributary drainage basin determining the location and magnitude of flows from upstream of the site based on current development or zoning, whichever provides the highest runoff volumes

c. A conceptual drainage plan showing how intercepted and on-site flows will be received and transported

d. Designated points of discharge from the site, accompanied by a general analysis of how existing downstream facilities will handle this discharge

e. Proposed rights-of-way required for drainage easements and detention areas

f. Storm water storage volume required.

g. Location of storage areas.

12. Narrative and illustrative elevations of design elements explaining how various design elements (landscaping, architecture, signage, street design, etc....) contribute to a unified appearance that is harmonious both internally and with surrounding properties in terms of scale, materials and color.

13. A table indicating the following:

    a. areas of the site for each proposed land use;

    b. the amount of building floor area proposed for each land use;

    c. number of parking and loading spaces for each land use;

    d. wetland areas, flood plain areas, area of ledge or outcroppings;

    e. overall lot coverage;

    f. and, building height(s).

14. Limits of phases where development is proposed in phases.

15. Such other relevant information as the applicant may wish to submit or the Commission may request.

4. Required Findings. In approving a Concept Plan, the Commission shall find:

a. the application and Concept Plan are complete;

b. that the proposed location of the land use areas on the site avoids placement of incompatible uses adjacent to one another;

c. that the transition between the different proposed uses is suitable and that adequate buffering is provided;

d. that the proposed land uses and development pattern satisfy the purpose and intent of the regulation as set forth in Section 1 and the standards and requirements of Sections 5 through 6.

5. Changes to Concept Plan.

f. Changes to an approved Concept Plan are required to be approved by the Commission unless the criteria 1 - 5 of Section 470.1 (Waiver of Site Plan review) are met.

g. Changes meeting the waiver criteria shall be reviewed and approved by the Director of Planning and Development.

### d. **MMUD District Special Permit Application**

1. A Special Permit application in conformance with Article VII, which includes submission of a Site Plan as outlined in Section 470.7, is required for each proposed use. The Special Permit application is also subject to the following requirements:

    a. Concept Plan.  If no Concept Plan has been approved for an MMUD district, and the Site Plan does not include proposed development for the entire MMUD District, or the proposed development is not restricted to an existing mill structure and development directly related to such mill structure (parking, landscaping, signs, etc....) a Concept Plan must be submitted with the Special Permit application(s) for a proposed use or uses. The Commission shall act on the Concept Plan prior to acting on the Special Permit application(s).

    b. Traffic Report. Report prepared by a professional traffic engineer stating that traffic conditions as described in the approved Concept Plan traffic report have not changed or, if they have, in what way.

    c. A tabular statement of zoning conformance with respect to each land use type contained on the Concept Plan.

    d. In addition to the criteria for special permit approval the requirements and findings of this section must be met.

    e. Conformance with Section 6, Performance and Compatibility Standards.

1. Changes to Special Permit Site Plan. Changes to an approved Special Permit Site Plan are to be approved by the Commission unless criteria 1 - 5 of Section 470.1 (Waiver of Site Plan Review) are met. Changes meeting the waiver criteria shall be reviewed and approved by the Director of Planning and Development.

2. Change in uses within mill structures is also permitted for situations where a use has already been approved in accordance with these regulations upon review and approval by the Planning and Development Office, when

such use does not change the compatibility of such new use with those existing within the mill structure and the change in use does not result in an expansion of space greater than twenty-five (25) percent or ten-thousand (10,000) square feet, whichever is greater.

a.  The Planning and Development Office, at their discretion, may forward any such request to the Commission for review.

b.  The Planning and Development Office may require such information, as it deems appropriate to evaluate any such application, including those listed in subsection c of this section

c.  The Director of the Planning and Development Office shall make a report of any decisions made under this section to the Commission at the next Regular Meeting of the Commission following such decision.

Section 445.8    Invalidity

These MMUDD Regulations are designed to form a cohesive and integrated response to the problem of rehabilitation and re-use of existing mill structures. Therefore the partial illegality or invalidity of any portion of these regulations shall result in the invalidity of the entire MMUDD Regulations.   At the point at which applications under the MMUDD regulations have been filed with the commission, have been certified to be substantially complete with all attendant submittals, and have been received/accepted by the Planning and Zoning Commission, the applications are protected and exempted from any actions or decisions that may result from this invalidity section.

Adopted April 19, 2004

Effective Date May 20, 2004, 12:01 AM